IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs August 3, 2004

## DONAVAN EDWARD DANIEL  v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Weakley County**
**No. CR34-2003     William B. Acree, Jr., Judge**

———————

**No. W2003-02511-CCA-R3-PC  - Filed September 27, 2004**

———————

Petitioner, Donavan Edward Daniel, filed a *pro se* petition for post-conviction relief alleging, as amended, that his trial counsel provided ineffective assistance of counsel by failing (1) to raise the legality of Petitioner's detention as an issue in his motion to suppress; (2) to demonstrate a particularized need for expert services and timely present the affidavit of the proposed expert to the trial court; and (3) to request a mistrial or curative instruction when two prospective jurors stated during voir dire that they were familiar with Petitioner's juvenile record and family background. Following an evidentiary hearing, the post-conviction court denied Petitioner's request for post-conviction relief.  After a thorough review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

Kent F. Gearin, Martin, Tennessee (on appeal) and Joseph P. Atnip, District Public Defender; and Colin Johnson, Assistant Public Defender (at trial) for the appellant, Donavan Edward Daniel.

Paul G. Summers, Attorney General and Reporter; Michelle Chapman McIntire, Assistant Attorney General; Thomas A. Thomas, District Attorney General; and Allen Strawbridge, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**I.  Background**

Following a jury trial, Petitioner was convicted of one count of first degree premeditated murder of Clarence Jones, one count of first degree felony murder of Tamakia Thomas, one count of especially aggravated robbery and one count of possession of marijuana with the intent to sell. The jury sentenced Petitioner to life imprisonment for the premeditated murder conviction and life

imprisonment without the possibility of parole for the felony murder conviction. Following a sentencing hearing, the trial court sentenced Petitioner to twenty years for the especially aggravated robbery conviction and one year for the possession conviction, and ordered the sentences to be served concurrently. Petitioner was a juvenile at the time the offenses were committed.

On appeal, this Court upheld the sufficiency of the evidence supporting Petitioner's premeditated and felony first degree murder convictions. *State v. Donavan Edward Daniel*, No. W2000-00981-CCA-R3-CD, 2001 WL 1690196, at *1 (Tenn. Crim. App., Jackson, Dec. 28, 2001), *perm. to appeal denied* (Tenn. 2002). Petitioner also appealed the admissibility of his statements made after his arrest and the trial court's denial of Petitioner's motion for expert services. *Id.*

On appeal, Petitioner argued that the statements made during his initial interviews were inadmissible because the police did not have probable cause to detain him, his confession was obtained without a knowing and voluntary waiver of his *Miranda* rights, and his statements were not voluntarily made because of the lack of sleep and food during the interrogation process. Because Petitioner raised the issue concerning the legality of his initial detention for the first time on appeal, this issue was waived. *Id.* at *6. The evidence presented during Petitioner's suppression hearing that pertains to Petitioner's remaining two issues was summarized by this Court as follows:

> The defendant's mother brought him to the police station for questioning between eight and ten o'clock p.m. the day after the murders were committed. The defendant was not a suspect at this time. However, the police had received information indicating that the defendant was the last person to see the victims alive. The defendant did not make any incriminating statements during the first interview with police and returned home with his mother. After verifying that the defendant had lied about what time he arrived home the night of the murders, the police asked the defendant's mother to bring him back to the station. The defendant and his mother returned to the station. At around midnight, the defendant gave another written statement, which was not incriminating. The interviewing officer did not Mirandize the defendant prior to him making the statement. Around one o'clock a.m., the defendant was Mirandized and questioned again by two other officers. This questioning lasted until about two-thirty a.m., when the defendant's mother asked if they could go home and get some rest. The officers indicated that the defendant was free to go but requested that they be allowed to search his residence. The defendant's mother gave her permission for the search, and the officers followed her and the defendant home.

> At the defendant's residence, the officers did not permit the defendant to enter his home because of the possibility that he might contaminate the scene. At least one officer remained outside with the defendant at all times. He was not permitted to lie down in his mother's car to rest because the officers were afraid that he might try to leave. Therefore, the defendant alternately sat and laid down on the sidewalk and the hood of his mother's car. At some point before dawn, the officers decided to call the

crime scene van to conduct a more thorough search for evidence. While they waited for the van to arrive, one of the officers searched a nearby dumpster and found a bag of marijuana and some clothing inside. The officer immediately confronted the defendant with what he had found. At first, the defendant denied any knowledge about the items that were found but later admitted, after talking with his mother, that he had placed the marijuana in the dumpster. The defendant said that the victim, Clarence Jones, had "fronted him" the marijuana but continued to deny involvement in the murders.

While they waited for the crime scene van to arrive, the defendant and an officer, Captain Moore, discussed the seriousness of the crimes and the possible punishments. Captain Moore advised the defendant that it would be in his best interest to cooperate with the investigating officers. After the crime scene van arrived, the defendant's arms were tested for gun residue and his shoes were taken to test what appeared to be blood splatter on them. Once the officers were apprized of the blood splatter evidence and identified a ring, found in the bag of marijuana, belonging to the victim, the defendant was handcuffed and told that he was being placed under arrest for possession of marijuana. At this point, the defendant confessed to the murders. The defendant's mother was notified that the defendant was being taken into custody, and a juvenile officer was called to the scene. At around eight o'clock a.m., the defendant was transported to the police station. Once there, the defendant was given Miranda warnings again and signed a written waiver before giving a written confession.

The defendant's allegations concerning the promises of leniency were disputed at the suppression hearing. Captain Moore was asked if he told the defendant that he would get the death penalty if he did not cooperate with police. Captain Moore responded that he did not recall ever mentioning the death penalty to the defendant. He admitted, however, to advising the defendant that "this was a crime that could land him in jail for a lot of years" and that it would be to his benefit to cooperate with the police. Captain Moore further admitted that during the discussion with the defendant concerning possible punishments, he was not aware that the death penalty was not available as a punishment for juvenile defendants. Captain Moore said that the juvenile officer advised him of such after his conversation with the defendant but continued to maintain that the death penalty was never discussed with the defendant.

The defendant and his mother both testified and related their version of how the events transpired. The defendant said he had slept until noon the day he was questioned but alleged that he was still very tired during the late-night/early-morning questioning. He also testified that Captain Moore told him if he cooperated by confessing to the crimes, he might not get the death penalty. The defendant said that this conversation occurred in his mother's bedroom after Captain Moore accompanied

him to the bathroom, and that no one else was present at the time. The defendant further alleged that after Captain Moore placed handcuffs on him and placed him in the back of a police car, he told the defendant that it was his last chance to talk. He said that Captain Moore then asked if he wanted to take "a little walk to talk." The defendant testified that he believed the Captain to be saying that it was his last chance to avoid the death penalty. The defendant claimed that he confessed to the murders because of his physical exhaustion and fear of the death penalty.

The defendant's mother verified that the defendant was questioned off and on from sometime around nine o'clock p.m. until the next morning when he was arrested and taken into police custody. She testified that the defendant was very tired and that she requested several times that he be allowed to sleep on the couch. She said that the officers would not let the defendant lie down in her car even though she had the keys and there were two cars parked behind it. She did not hear Captain Moore mention the death penalty.

*Id.* at *6 - 8.

Based upon a review of the record, a panel of this Court concluded that the evidence did not preponderate against the trial court's finding that Petitioner knowingly and voluntarily waived his *Miranda* rights and that his statements were voluntarily made. *Id.* at *9.

Prior to trial, Petitioner filed an ex parte motion requesting the appointment of a mitigation expert at the State's expense. Petitioner did not present the affidavit of the proposed expert during the hearing. The trial court denied Petitioner's motion because it concluded that the court did not have the authority to appoint such an expert in a non-capital case. On appeal, this Court observed that expert services are available to an indigent defendant in both capital and non-capital cases. *Id.* at 10 (citing *State v. Barnett*, 909 S.W.2d 423 (Tenn. 1995)). The court concluded, however, that Petitioner failed to meet the *Barnett* requirements by failing to show a particularized need for the services of an expert and that the services would assist in the preparation and conduct of his trial. *Id.* at 11.

## II. Post-Conviction Hearing

Petitioner's trial counsel testified that he only raised the issue of the voluntariness of Petitioner's confession in the motion to suppress because, in his opinion, Petitioner's detention before he confessed was lawful. Petitioner did not make any incriminating statements during his first two interviews, and his confession was made after the police arrested Petitioner for possession of a controlled substance. Counsel conceded that Petitioner was in custodial detention during the consensual search of his mother's house but said that Petitioner voluntarily approached one of the police officers after he was arrested and told him that he had something to say. Counsel agreed that it might have been prudent to include the issue of an unlawful detention within his motion to suppress.

Petitioner's counsel said that he contacted Dr. Frank Einstein as a potential expert witness on December 2, 1999. Counsel believed that he discussed his own personal observations about Defendant and his background with Dr. Einstein and sent Dr. Einstein a copy of the mental evaluation performed by the West Tennessee Mental Health Institute. Dr. Einstein provided an affidavit outlining his qualifications, the scope of his services, and his fees. Dr. Einstein stated in the affidavit that one of the goals of his engagement would be to identify any mitigating factors that could be presented to the jury during Petitioner's sentencing hearing. Dr. Einstein's affidavit, however, was not filed with the court until September 6, 2000.

Counsel admitted that he did not have Dr. Einstein's affidavit at the time the ex parte hearing on Petitioner's motion for expert services was held. He stated that he had tried to identify a particularized need for Dr. Einstein's services prior to the ex parte hearing but was unable to do so. Instead, counsel told the trial court that Dr. Einstein's services were necessary to make sure that he did not miss anything that might be useful as a mitigating factor during sentencing. In any event, counsel explained that Dr. Einstein's affidavit did not address the issue of a particularized need.

Counsel said that he recollected the two jurors' statements about Petitioner during voir dire. Prospective juror Kilgas said that she worked for the Tennessee Department of Human Services in Dresden and had worked with Petitioner and his family both before and after the offenses were committed. Prospective juror Cianfarani told the trial court that she had been Petitioner's juvenile probation officer at one time. The exchange between the State and the prospective jurors was brief, and the trial court promptly excused both jurors for cause. Counsel said that he did not request a mistrial or ask for any type of curative instruction because he did not want to draw undue attention to the jurors' comments. Counsel estimated that he had spent many hours preparing for and defending Petitioner's case. He stated that he would not have approached Petitioner's case any differently.

Petitioner testified that he met with his trial counsel three or four times prior to trial, and that each visit lasted approximately twenty to thirty minutes.

Based upon the evidence before it, the post-conviction court found that Petitioner had failed to show by clear and convincing evidence that his trial counsel's conduct was deficient and denied Petitioner post-conviction relief. As to Petitioner's suppression issue, the post-conviction court found that Petitioner failed to establish prejudice by showing that the result of the suppression hearing would have been any different had counsel raised an issue as to the legality of Petitioner's detention.

### III. Standard of Review

A petitioner seeking post-conviction relief must establish his allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f) (1997). However, the trial court's application of the law to the facts is reviewed *de novo*, without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). A claim that counsel rendered ineffective assistance is

a mixed question of fact and law and therefore also subject to de novo review. *Id.*; *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must establish that counsel's performance fell below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In addition, he must show that counsel's ineffective performance actually adversely impacted his defense. *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067, 80 L. Ed. 2d 674 (1984). In reviewing counsel's performance, the distortions of hindsight must be avoided, and this Court will not second-guess counsel's decisions regarding trial strategies and tactics. *Hellard v. State,* 629 S.W.2d 4, 9 (Tenn. 1982). The reviewing court, therefore, should not conclude that a particular act or omission by counsel is unreasonable merely because the strategy was unsuccessful. *Strickland,* 466 U.S. at 689, 104 S. Ct. at 2065. Rather, counsel's alleged errors should be judged from counsel's perspective at the point of time they were made in light of all the facts and circumstances at that time. *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066.

A petitioner must satisfy both prongs of the *Strickland* test before he or she may prevail on a claim of ineffective assistance of counsel. *See Henley v. State,* 960 S.W.2d 572, 580 (Tenn. 1997). That is, a petitioner must not only show that his counsel's performance fell below acceptable standards, but that such performance was prejudicial to the petitioner. *Id.* Failure to satisfy either prong will result in the denial of relief. *Id.* Accordingly, this Court need not address one of the components if the petitioner fails to establish the other. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

## IV. Analysis

A. Motion to Suppress

Petitioner argues that his trial counsel was deficient for not raising the legality of Petitioner's detention in his motion to suppress and that, had he done so, Petitioner's subsequent confession would have been inadmissible as the fruit of that unlawful seizure. The post-conviction court found that even assuming *arguendo* that Petitioner's initial detention was unlawful, Petitioner's confession would not have been suppressed if the issue had been raised.

In providing effective assistance, "[d]efense counsel 'must conduct appropriate investigations, both factual and legal,' and 'must assert them in a timely manner.'" *State v. Nichols*, 90 S.W.3d 576, 587 (Tenn. 2002) (*qouting Baxter*, 523 S.W.2d at 932, 935). If defense counsel has made adequate investigation, we may not second guess counsel's strategic or tactical choices. *Hellard*, 629 S.W.2d at 9. Petitioner's counsel testified that he discussed Petitioner's confession with him and could not conclude under the facts presented to him that the confession was made as a result of an unlawful detention. He chose, therefore, to challenge the voluntariness of Petitioner's confession in his motion to suppress. The fact that this defense ultimately proved unsuccessful on

appeal does not by itself support a finding of deficiency in performance. *See Thompson v. State*, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997).

Based on our review, we cannot conclude that the evidence preponderates against the post-conviction court's finding that Petitioner would not have been successful had he raised the issue of an unlawful detention. Petitioner argues that his initial questioning represented an unlawful seizure because he was not free to leave the police station and could not refuse to answer the officers' questions. Not every interaction between a police officer and a citizen, however, rises to the level of a seizure. *See Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968). Under appropriate circumstances and in an appropriate manner, a police officer may question a person for the purposes of investigation even though the officer does not at that time have probable cause to make an arrest. *Id.* at 19 n.16, 88 S. Ct at 1878 n.16. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *State v. Daniel*, 12 S.W.3d 420, 424 (Tenn. 2000).

The police asked Petitioner to come to the police station for questioning when they learned that he was the last person to see the victims alive. Petitioner arrived at the police station for the two questioning sessions on his own volition and accompanied by his mother. Upon his mother's request, Petitioner was permitted to leave the station after he completed his first written statement. Petitioner was asked to return to the station after certain discrepancies in his first statement were detected. After he gave his second written statement, Petitioner was read his *Miranda* rights and then questioned again. On appeal, this Court concluded that the police officers complied with the *Miranda* requirements and that Petitioner knowingly waived those rights. *Daniel*, 2001 WL 1690196, at *9.

Petitioner does not dispute the consensual nature of the ensuing search. After he admitted that the marijuana found in the dumpster was his, Petitioner was placed under arrest. Without any prompting from the police, Petitioner then confessed to the other offenses. The evidence does not preponderate against the post-conviction court's findings that Petitioner failed to establish that he was prejudiced by his counsel's decision not to question the legality of his detention during the consensual search of his mother's house. Petitioner is not entitled to relief on this issue.

## B. Expert Services

Petitioner argues that his counsel provided ineffective assistance when he failed to support his motion for expert services with Dr. Einstein's affidavit. Petitioner contends that it is reasonable to conclude that the trial court would have granted Petitioner's motion if Petitioner had presented Dr. Einstein's affidavit. The trial court, however, denied Petitioner's motion because it did not believe that it had the authority to authorize a mitigation expert at the state's expense in a non-capital case. Under the trial court's analysis, Dr. Einstein's affidavit would not have been helpful one way or the other.

Petitioner's counsel said that he was aware prior to trial that Petitioner had used alcohol and drugs since he was about fifteen years old and that Petitioner's mother and grandmother had been diagnosed with bipolar disorder. Counsel stated, however, that the mental evaluation performed by the West Tennessee Mental Health Institute did not show that Petitioner had any disposition toward bipolar disorder. Counsel said that he was able to place before the jury the fact that Petitioner had been taking drugs and drinking alcohol all day prior to the commission of the offenses. Although Petitioner pointed out that he was a high school drop out, he does not say how that factor demonstrates a particularized need for a mitigation expert. Petitioner completed his G.E.D. and was scheduled to enter college in the fall. Based on the facts surrounding the case, counsel testified that he did not know of a particularized need that would justify the employment of an expert.

Petitioner did not offer any evidence at the post-conviction hearing in support of a particularized need for an expert witness, other than Dr. Einstein's affidavit. This Court has already concluded on appeal that Dr. Einstein's affidavit does not support Petitioner's particularized need for an expert witness under the *Barnett* requirements. *Daniel*, 2001 WL 16901096, at *11. Petitioner, therefore, failed to set forth any proof of prejudice assuming his counsel had rendered ineffective assistance with regard to his request for an expert. Petitioner is not entitled to relief on this issue.

C. Voir Dire

Petitioner argues that his trial counsel was ineffective for failing to request a curative instruction or a mistrial when two of the prospective jurors stated that they were familiar with Petitioner. The two jurors were promptly excused for cause. Trial counsel testified that he chose to remain silent in order not to call undue attention to the remarks. The post-conviction court accredited trial counsel's testimony on this issue and declined to second guess his trial tactics. In addition, the post-conviction court found that Petitioner had not shown that he was prejudiced by the remarks.

Comments from a prospective juror in response to questions during voir dire that are unfavorable to the defendant are not grounds for a mistrial absent evidence showing that the jury which heard the case was prejudiced or biased by the comments. *State v. Brown*, 795 S.W.2d 689 (Tenn. Crim. App. 1990) (citing *State v. Porterfield*, 746 S.W.2d 441 (Tenn. 1988)). The evidence does not preponderate against the post-conviction court's finding that Petitioner failed to show that counsel's response to the situation was deficient or that the complained of comments prejudiced or biased the jury. Petitioner is not entitled to relief on this issue.

**CONCLUSION**

After a thorough review of the record, we affirm the judgment of the post-conviction court.

_____
THOMAS T. WOODALL, JUDGE